OAKLAND METAL STAMPING COMPANY *v.* FOREST
INDUSTRIES, INC.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—ABANDONMENT.
   An issue that was raised in the trial court but abandoned on
   appeal will not be considered by the Supreme Court.

2. SET-OFF AND RECOUPMENT—BURDEN OF PROOF—BREACH OF CON-
   TRACT.
   The defendant has the burden of proving plaintiff had breached
   the contract sued upon as a basis for the plea of set-off and
   recoupment interposed.

3. APPEAL AND ERROR—NONJURY CASE—FINDINGS OF TRIAL JUDGE—
   PREPONDERANCE OF EVIDENCE.
   The trial judge's findings as to disputed facts are accepted on
   appeal in a nonjury case, where the evidence does not prepon-
   derate to the contrary of his view.

4. DAMAGES—BREACH OF CONTRACT—MITIGATION OF DAMAGES.
   A defendant, claiming plaintiff had breached the contract sued
   on, had the duty of using every reasonable effort to mitigate
   damages.

5. SAME—MITIGATION.
   The measure of damages suffered by defendant who had con-
   tracted with plaintiff to have latter perform certain operations
   on bumper parts would be the cost of the material used but
   improperly fabricated by plaintiff before defendant's agent
   had opportunity to inspect and ascertain the unsatisfactory
   quality of plaintiff's work, and not the cost of the entire
   amount of material involved including that first delivered, less
   scrap value of material in first shipment delivered.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 770.
[3] 3 Am Jur, Appeal and Error § 900.
[4, 5] 15 Am Jur, Damages § 30 *et seq.*
[6] 3 Am Jur, Appeal and Error § 1173.
[7] 14 Am Jur, Costs § 98.

6. APPEAL AND ERROR—REMAND—CORRECTIVE RELIEF.

Judgment in a reduced amount is ordered entered in a nonjury case on defendant's claim of set-off and recoupment, where liability was properly imposed upon plaintiff but an improper measure of damages was applied, it being within the power of the Supreme Court to require the making of such order for relief as should have been made by the trial court (Court Rule No 72, § 1 [g] [1945]).

7. COSTS—NEITHER PARTY PREVAILING IN ENTIRETY ON APPEAL.

No costs are allowed on appeal from judgment for defendant on its plea of set-off and recoupment, where both parties have appealed and judgment is reduced in part, since neither party has prevailed in the entirety.

Appeal from Wayne; Fitzgerald (Neal E.), J. Submitted January 16, 1958. (Docket No. 20, Calendar No. 47,101.) Decided April 14, 1958.

Action by Oakland Metal Stamping Company, a Michigan corporation, against Forest Industries, Inc., a Michigan Corporation, for services performed in manufacturing process. Cross declaration for damages resulting from improper work. Judgment for defendant for partial amount of claim. Plaintiff appeals. Defendant cross-appeals. Reversed and remanded for entry of judgment for defendant in lesser amount.

*Love, Snyder & Lewis* (*Leon H. Lewis,* of counsel), for plaintiff.

*Harris W. Wienner,* for defendant.

EDWARDS, J. Herein each of 2 companies seeks to allocate to the other the loss occasioned when some 5,000 pairs of Chevrolet bumper replacement parts proved unmarketable. Plaintiff and cross defendant below, Oakland Metal Stamping Company, sued defendant and cross plaintiff, Forest Industries, Inc., for the value of its services in die tryout work and

stamping work in blanking, piercing and forming the bumper parts in the sum of $3,807.97. In turn, Forest claimed set-off and recoupment against Oakland in the sum of $12,748.26 for its damages resulting from improper fabrication of the bumpers. This sum consisted of $6,006.92, the cost of the steel, with the balance being the cost to Forest of plating, polishing, buffing, packing and shipping the bumpers, plus Forest's anticipated profit on the whole job.

The trial judge hearing the matter without a jury denied Oakland's claim for the value of its services, holding that Oakland had failed to bear the burden of proof that it had complied with the contract.

As to Forest's set-off and recoupment, the judge gave judgment for the cost of the steel minus its value as scrap, in the sum of $5,400—denying the balance of Forest's claim on the grounds that before it plated, buffed, polished and shipped the parts it had ample opportunity to ascertain whether or not the parts were satisfactory.

On appeal Oakland abandoned its original claim for its services, but appeals from the judgment entered against it, and Forest in turn cross-appeals for the sum of the total damages it claimed.

This transaction arose when Forest Industries undertook to make and sell to dealers all over the country some 5,000 pairs of replacement bumpers for the 1949–1952 Chevrolets. Forest had secured some dies for the purpose of fabricating these parts but, having no presses, brought the dies to Oakland to have it do the stamping work. After a number of unsuccessful tryouts of the dies on the Oakland presses, between which Forest would take the dies away and have more work done thereon, they finally ran a test with representatives of both companies present where bumpers were produced which satisfied Forest.

Forest's president, Beckerman, then drafted a contract which was signed by both parties and which is the basis for this litigation. The key paragraphs are as follows:

"It is hereby mutually agreed between Forest Industries and Oakland Metal Stamping Company that Oakland Metal Stamping Company will run 5,000 pr. Chevrolet 1949–52 right and left end bumper bars to replace original part Nos. 3698605–6 at a cost of .27c each. Forest Industries to furnish steel for same."

"This agreement automatically becomes a purchase order for 5,000 pr. of Chev. 1949–52 bumpers to replace original part Nos. 3698605–6 to fit and look identically as the original parts."

The undisputed testimony indicates that the work contemplated by this contract called for 6 or 7 stamping operations and that the parties sought to handle the 3d and 4th forming operations with the same die. It appears that on the 4th operation the operator sought to put a "twist" in the bumper by placing it in the die by eye without a positive location for the piece. The variation resulting affected the location of the bolt holes in the following operation.

It likewise appears undisputed that all parties knew of the possibility of variation resulting from this "twist" operation, and that the decision to go ahead on the contract in this fashion was made in order to save the cost to Forest of making an additional die.

Forest took the precaution of stationing a man, one Dave Mazaroff, in Oakland's plant. His function is variously described. Oakland's foreman testified:

"*A.* Mr. Beckerman came in and told me that there was Dave Mazer, and he said that he is going to follow up your production.

"*Q.* Going to follow up your production?

"*A.* Yes, sir.

"*Q.* He was going to see that you went ahead and produced those so that they could make use of them?

"*A.* He was supposed to come over and check the pieces and accept them as we made them.

"*Q.* Is that what Beckerman told you?

"*A.* Yes, sir.

John J. Mann, an officer of Forest Industries, testified on the other hand:

"*Q.* Do you know a fellow by the name of Mazaroff?

"*A.* I certainly do.

"*Q.* Did you introduce him to John as 'Dave Mazer'?

"*A.* I didn't introduce him to anybody. Mr. Beckerman did.

"*Q.* Is that the name he went by at that time?

"*A.* Mr. Mazer was the name he operated under.

"*Q.* That is the name he operated under. He worked for Forest Industries?

"*A.* He did for a short while; yes.

"*Q.* And part of his job was to go into Oakland Metal Stamping and have something to do with the production of these bumpers?

"*A.* No. I wouldn't agree with that.

"*Q.* You won't agree with that?

"*A.* No, sir. He may have taken it upon himself, but he never had authority from us to do that. He was strictly a hired clerk.

"*Q.* Did you ever see him at Oakland Metal Stamping?

"*A.* Oh, I believe there were times he went over maybe to find out if pieces were ready, but he had no reason for checking anything, unless he took it upon himself. We had no reason to check them anyhow. We thought they were right."

On Mazaroff's (or Mazer's) function, the trial judge found as follows:

"It is further worthy of note in this case that the defendant had a man named Mazer whose duty it was, according to the testimony, and who had authority to so do according to the testimony,—to follow up and check the products of the plaintiff before they were to be accepted by the defendant. According to the plaintiff's testimony, everything that was shipped to the defendant was shipped upon the request of this man Mazer after he had checked the parts.

"It continues to be baffling to the court as to why Mr. Mazer would find them satisfactory when he checked them in the plaintiff's plant, and the defendant would then find them unsatisfactory when he shipped them to the ultimate users."

It appears that Oakland fabricated these parts and Forest picked them up at the Oakland plant. The first shipment of 1,700 pieces was May 18th, the last was 632 pieces on July 13th. All of these bumpers Forest received at its plant and plated, buffed, polished and shipped. It appears that Oakland's first notice of rejection came from Forest's officer, Mr. Mann, in late August of 1953 after shipments of bumpers had been returned by dealers.

The only testimony purporting to establish Forest's claim that all the bumpers were unmarketable as a result of variation in shape or size was Mann's:

"They wouldn't stick, because you couldn't put them on the bumpers. You couldn't spring them enough to stay put. The dealers refused to pay for them."

The trial judge rejected Oakland's claim for services, holding in effect that it had not carried the burden of proof of establishing that it had performed in accordance with its contract. As we have noted, this issue is abandoned on appeal.

As to Forest's set-off and recoupment, the trial judge reasoned as follows:

"In the opinion of the court, the defendant should be entitled to recover for the price of his steel, which is the sum of $6,000, less $600 scrap value which he admits that he has; but the court can see no reason why he should recover the sum of $4,404 for the plating and buffing, inasmuch as he had a man at the plaintiff's place of business whose duty it was to ascertain whether those parts were going to be satisfactory or not. If they were not satisfactory, he should have so determined and prevented the defendant from wasting his time and effort in buffing and plating parts that were obviously not going to be of any use to anyone.

"The court feels the same way concerning the $303 for freight. The defendant should have been advised by his own agent that these parts were not going to be satisfactory, and should not have shipped the same out at all.

"Therefore, the amount of $4,404, and $303, on the counterclaim, will be rejected.

"Judgment will be entered as against the plaintiff's claim of no cause for action; and judgment will be entered on the counterclaim in favor of the defendant in the sum of $5,400. No costs."

On its plea for set-off and recoupment Forest plainly had the burden of proving that Oakland had breached the contract. On the facts as revealed by this record we feel that there is a close question as to whether or not Oakland breached the contract at all. The trial judge, however, saw the witnesses and heard their testimony. We cannot say the evidence preponderates to the contrary of his view, and we accept his findings as to the disputed facts. *Jones v. Eastern Michigan Motorbuses,* 287 Mich 619; *Pogletke v. Schwanz,* 349 Mich 129.

However, even if Oakland breached its contract, Forest obviously had the duty to use every reasonable effort to mitigate damages. *Chandler v. Allison,* 10 Mich 460; *Rich v. Daily Creamery Co.,* 296 Mich

270 (134 ALR 232); *Carter* v. *State Farm Mutual Automobile Insurance Co.*, 350 Mich 535.

This Forest plainly did not do. The trial judge found that Forest "had a man at the plaintiff's place of business whose duty it was to ascertain whether those parts were going to be satisfactory or not. If they were not satisfactory, he should have so determined and prevented the defendant from wasting his time and effort in buffing and plating parts that were obviously not going to be of any use to anyone."

Upon the findings of fact and the reasoning of the trial judge, the measure of Forest's damage would be the cost of the steel improperly fabricated by Oakland prior to Forest's agent having opportunity to inspect and ascertain the unsatisfactory quality of its work. After Mazaroff had received the first 1,700 pieces, Forest knew or should have known that the job was going awry and should have given a stop order to mitigate damages. The damages assessed should not be the total cost of the steel less its scrap value, but rather the cost of the steel involved in the first delivery less its scrap value. This can be computed upon a proportionate basis.

The judgment is vacated and the case remanded for entry of judgment in accordance with this opinion. See Michigan Court Rule No 72, § 1(g) (1945). No costs, neither party having prevailed in the entirety.

Dethmers, C. J., and Carr, Kelly, Smith, Black, Voelker, and Kavanagh, JJ., concurred.